U.S. DISTRICT COURT
DISTRIC...

Jan 29  ... on PM '99

FILED IN ...
OFFIC.

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

VICTOR BUSSIE, MORLEY MORGANA,      *
QUENTIN DAWSON and MARGARET      *
DAWSON individually and as representatives      *    CIVIL ACTION NO.
of all others similarly situated      *
     *    97-40204
VERSUS      *
     *
ALLMERICA FINANCIAL CORPORATION,      *
SMA FINANCIAL CORPORATION, FIRST      *
ALLMERICA FINANCIAL LIFE INSURANCE      *
COMPANY and ALLMERICA FINANCIAL      *
LIFE INSURANCE AND ANNUITY COMPANY      *

## Declaration of Samuel Issacharoff

Samuel Issacharoff declares pursuant to 28 U.S.C. § 1746 as follows:

### Introduction

1.      I have been asked by plaintiffs' counsel to evaluate the amenability of the claims alleged in this action to nationwide class certification under Fed. R. Civ. P. 23 for purposes of settlement. In particular, I have been asked to give an opinion on whether the claims presented pose conflicts within the class such as to defeat the requirements of predominance and adequacy of representation as construed in *Amchem Products v. Windsor*, 117 S.Ct. 2231 (1997). I will answer each of these questions in some detail. My bottom line is that this case could have been certified and managed as a litigation class, that the structure of the proposed settlement satisfies the requirements of Rule 23, and that the class is appropriately certified as a settlement class under *Amchem*.

2.      I have previously filed declarations in two cases the allegations of which for all intents and purposes, are substantially similar to the present case. *See In re National Life Insurance Company*, Civ. A. No. 2:97-CV-314 (D. Vt. 1998); *Duhaime v. John Hancock Mutual Life Ins. Co.*, 1997 WL 809558 (D. Mass. 1997). In each case the Court accepted my declaration in support of a proposed class action settlement of a "vanishing premium" insurance class action. I have examined the settlement materials in this case, together with the pleadings. It is my opinion



that this case is substantially similar in all relevant allegations to the cases resolved by settlement in *In re National Life* and *Duhaime*. Accordingly, I will largely reproduce the points made in my declarations submitted in support of the certification of a settlement class in those cases.

3.   I will proceed by first stating my qualifications, then by looking at the actual claims presented in this action to determine whether they fit the requirements for cases to be litigated as class actions, and then by turning to similar judicial experience with nationwide consumer class actions.

## Qualifications

4.   As reflected in my attached curriculum vitae, I am the Joseph D. Jamail Centennial Chair in Law at the University of Texas School of Law. At present, I am a visiting professor at Columbia Law School. I graduated from Yale Law School in 1983 and clerked for Judge Arlin M. Adams of the United States Court of Appeals for the Third Circuit in 1983-84. I practiced law between 1984 and 1989 in Philadelphia and Washington, D.C., during which time I specialized in complex federal litigation. In 1989, I joined the faculty of the University of Texas School of Law and became a full professor in 1993. I teach federal civil procedure, complex litigation, legal process, employment law, and constitutional law. I lecture and publish routinely on matters of complex litigation.

5.   I have served as counsel, consultant, expert witness or special master in dozens of class actions in both federal and state courts. I have represented or served as an expert for both plaintiffs and defendants, and was appointed to the special master team in the Western District of Texas asbestos litigation known as *Cimino v. Fibreboard*, 751 F. Supp. 649 (E.D. Tex. 1990), *rev'd sub nom, In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990). I was also counsel for plaintiffs and directly responsible for the certification of a litigation class in *James A. Justice, et al. v. Great-West Life Assurance Company, et al.*, The District Court of Dallas County, Texas, No. 94-3155 ("*Great-West Life*"), which, to the best of my knowledge, was the first nationwide class action certified in a contested certification proceeding in a case challenging "vanishing premium" insurance sales.

6.      In addition, I served as an expert on the manageability of large, multi-state class actions in *In re Prudential Ins. Co. Of America Sales Practices*, 962 F. Supp 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 67 U.S.L.W. 3364 NO. 98-819 (U.S. JANUARY 19,1999) and *In re: National Life of Vermont Life Insurance Company*, 97 CV 314, In the United States District Court for the District of Vermont ,. That case involved vanishing premium and improper replacement ("churning") claims similar to those asserted in this case. In *In re Prudential*, the district court relied extensively on my analysis of the manageability of a nationwide class action in certifying a settlement class. *See* 962 F. Supp. at 525. I also served as an expert witness in an action against John Hancock Life Insurance Company, involving vanishing premium and churning claims practices and claims. *Duhaime v. John Hancock Mutual Life Ins. Co.*, 1997 WL 809558 (D. Mass., filed Dec. 31, 1997). In *Duhaime*, Judge O'Toole relied on my analysis in approving the certification of a class for settlement purposes.

7.      In both my academic work in the field of complex litigation and in my experience in actual cases, one of my primary focuses has been on the dynamics of aggregate litigation. Based on this expertise, I offer my opinion that this case can properly be certified and maintained as a class action.

8.      Before preparing this Declaration, I reviewed, among other things: the Second Amended Complaint, Plaintiffs' Memorandum in Support of Motion for Class Certification, Plaintiffs' Motion for Order Certifying a Class for Settlement Purposes, a number of Bates-stamped documents of the Defendant that had been produced as part of the discovery process, and the Stipulation of Settlement, and the Findings and Order Certifying a Class for Settlement Purposes, Appointing Lead Counsel for the Class, Directing Issuance of a Class Notice to the Class, and Scheduling a Fairness Hearing.

## The Litigation of Group Claims

9.      The modern class action has now emerged as the preeminent procedural device for litigating group claims of limited individual value. Class actions were designed to cure two distinct problems: first, the economic barriers to the prosecution of small value claims, and second, the fact

that trial of a large number of small, repetitive claims was less efficient for the judicial system than trial of a single consolidated class action.

10.     These concerns highlight the importance of the class action device for consumer protection claims. Both the common law and the consumer protection laws of most states allow for, and indeed encourage, private enforcement of prohibitions on consumer fraud. The ability to vindicate substantive rights against consumer fraud requires mechanisms to aggregate the small and diffuse claims of consumers, lest the small stake of each individual present an insurmountable hurdle for individual litigants. The most effective such mechanism for aggregating consumer claims is the class action. This is in perfect keeping with the teachings of the U.S. Supreme Court:

> The aggregation of individual claims in a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of the government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device. *Deposit Guaranty Bank v. Roper*, 445 U.S. 326, 339 (1980).

The U.S. Supreme Court has further recognized that class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually," and as a result, "most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) (discussing the need for a class action in the context of claims averaging about $100 per plaintiff class member). This is the clear theme in U.S. Supreme Court jurisprudence on class actions, as reiterated last Term in *Amchem:*

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor. *Amchem Products, Inc. v. Windsor*, 117 S. Ct. 2231, 2246 (1997), *quoting Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997).

11.     Typically, the most critical issues in the types of class actions that the courts now routinely confront comes in the factors grouped under Rule 23(b)(3): the predominance, superiority and manageability concerns that must be satisfied for the court to certify a class. I believe that the cases before the courts, both federal and state, can be grouped along a spectrum ranging from cases that involve primarily economic harm at one end, and cases that are based more on personal injuries at the other. As a general matter, the closer the cause of action appears to be grounded in market-based harms, the more amenable the case is likely to be to class treatment. By contrast, the more individual tort-based the theory of harm, the more difficult the prospect of successful class treatment. *See, e.g., Castano v. American Tobacco Company,* 84 F.3d 734 (5th Cir. 1996). This is exactly the distinction that the Court drew between the personal injury asbestos claims presented in *Amchem* and the types of claims found in consumer cases: "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 117 S. Ct. at 2250.

12.     While the division between economic harms and personal injuries is, as a general matter, descriptively accurate in distinguishing cases that are amenable to class treatment from those that are not, the reason does not lie in the underlying substantive law claims as such. Rather, the primary difference lies in the nature of the presentation to be made at trial. The key inquiry is whether "one set of operative facts" will significantly advance the liability determination and apply roughly equally to the relation between each potential class member and each defendant. *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1988); *see also Castano,* 84 F.3d at 744 ("going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues").

13.     One useful way of thinking about the difference between cases that may successfully be handled as class actions and those that may not is to ask whether the trial will focus on the "upstream" conduct of the defendant or the "downstream" harm to individual plaintiffs. Where, as here, the trial will focus upon a definable course of conduct of the defendant, and where

the assessment of harm and calculation of damages will flow directly from the source of the defendant's alleged liability, a class action treatment will be a superior method of adjudicating all common issues. The reason that mass tort cases face great difficulties in the courts is that they often combine both diffuse upstream conduct (as in long-term environmental exposures) *and* highly individuated assessments of subjective harm (as with claims for emotional distress, pain and suffering, or long-term disability) and causation. By contrast, the reason that securities cases, antitrust claims, and uniform deceptive marketing-based claims fit more comfortably into the class action format is that the definitions of harm are generally focused on a particular course of conduct of the defendant(s) and the resulting damages are capable of being calculated in the same fashion as utilized to define liability. In many such cases, the harms may be calculated administratively from the defendant's records. The same is true here.

14.      This action, which alleges uniform deceptive marketing of defective life insurance policies, fits comfortably within the general framework of antitrust and securities class actions as cases that focus on the course of conduct of a particular defendant. Such cases in effect claim that a defective product was launched into the stream of commerce in such fashion as to have a predictable harm among all downstream consumers. In such cases, there are no intervening events that mitigate the harm and no readily accessible independent sources of information by which consumers may avoid the harms resulting from a defective product (or from a monopolistically priced product, in antitrust cases). Moreover, in such cases the harms flow from the objectively and administratively calculable difference between the product as represented and the product as provided. *See, e.g., Cope v. Metropolitan Life Insurance Company,* 696 N.E. 2d 1001 (S. Ct. Ohio, 1998)(finding that similar insurance fraud claim "appears to present the classic case for treatment as a class action, and cases involving similar claims or similar circumstances are routinely certified as such"). In this sense, the current deceptive insurance sales practices cases are very much like the securities cases that are routinely subject to very large class action treatment in the federal courts. *See Amchem,* 117 S. Ct. at 2250.

15.    The conclusion is that effective private enforcement requires mechanisms to aggregate the small and diffuse claims of consumers lest the small stake of each individual present an insurmountable hurdle for individual private litigants. This is so for two reasons. First, the relative resources available to litigate an individual policyholder action against an insurance company such as Allmerica are grossly disparate. Second, the relative stakes of each party in the outcome are fundamentally different, even apart from the resources at hand: the concern for potential estoppel effects of an adverse result will cause the insurer to value a successful result as a far greater imperative than the policyholder with only a modest individual loss. This disparity in willingness and practical ability to invest in the prosecution of a claim explains why, in most instances, individual policyholders will be unable to attract independent private counsel even when the relative size of their claims is not insignificant. Judicial experience in this area also demonstrates that the most effective mechanism for leveling the playing field by aggregating consumer claims is the class action. Aggregate litigation is indispensable if consumers are to play any role in preventing consumer fraud and thereby serve as a useful complement to public and quasi-public enforcement procedures. Moreover, the indispensability of aggregate litigation on behalf of consumers suggests why, amid the current disputes over class actions, it is the consumer class action that has emerged relatively unscathed as an example of effective aggregate litigation.

16.    This analysis is confirmed by the recent decision of the U.S. Supreme Court in *Amchem*. *Amchem* clearly instructs the district courts to conscientiously evaluate the certification of a settlement class, 117 S. Ct. at 2248, with two factors to be given particular scrutiny. First, the district court must determine whether common issues do in fact predominate. Two discrete inquiries bear on the predominance issue: a) do the claims of the class arise from the same course of conduct of the defendants; and b) are plaintiffs' counsel "disarmed" by their inability to prosecute the claims outside the settlement context? 117 S.Ct. at 2248-49. Second, the district court must determine whether plaintiffs' counsel are forced to make impermissible allocation decisions between differently situated groups within the plaintiff class. 117 S.Ct. at 2251. I will address the proposed settlement under this framework provided by the Court in *Amchem*.

### Predominance: Course of Conduct

17.    As set forth by the Supreme Court in *Amchem*, the predominance inquiry is designed to ensure that the interests of absent class members are protected: "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." 117 S.Ct. at 2249. In *Amchem*, the predominance requirement was defeated by claims arising out of different exposures to asbestos, claims arising under fundamentally disparate state law, and claims arising from different patterns of harm to the individuals. In particular, the class there purported to include members who were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods, such that some class members suffered no physical injury, some had only asymptomatic pleural changes, others had lung cancer (some of whom were smokers), other disabling asbestosis, and still others mesothelioma -- a disease with a latency period of 15 to 40 years. *Amchem*, 117 S. Ct. at 2243, 2250. Indeed, as to some class members, it was unclear whether they were ever exposed, and whether they would ever contract an asbestos-related disease and, if so, which one. *Id.* 117 S. Ct. at 2252.

18.    This action, by contrast, presents none of these intra-class disparities. The class is limited to purchasers of a particular product (a life insurance policy) from a particular vendor (Allmerica). The class members are readily identifiable, and have already allegedly suffered injury from the purchase of a product that was other than as represented to him or her. Unlike personal injury actions such as *Amchem*, here the restitution and/or money damages sought are subject to *objective* quantification; the amounts of overpayments or adjusted future payments are readily calculable without speculation. There is thus no danger of a conflict created by some class members seeking to maximize their own individual recoveries to the detriment of others. Nor is there any "futures plaintiffs" group within the class that cannot yet determine whether they have been injured by Allmerica's actions, as there was in *Amchem*; here all class members are past purchasers of an insurance product that was other than as represented and all class members have sustained present ascertainable injuries from the conduct of a single defendant. Furthermore, the

complaint alleges that all members of the plaintiff class were harmed by the centralized policies undertaken and directed by defendant. For example, Plaintiffs contend Allmerica manipulated its investments, dividend scales and interest rates to artificially promote the sales of aggressive new products during the class period. These manipulated investments, dividend scales and interest rates are the key to the vanishing premium aspect of the deceptive scheme whereby high investment returns were supposed to offset ongoing premium obligations of purchasers of whole life insurance policies. These manipulations were also the driving force behind the churning, performance and investment plan aspects of the alleged scheme by defendant during this period. Because all Allmerica policyholders were adversely affected by Allmerica's investment practices and its dividend and interest rate practices, Allmerica allegedly visited a centralized harm upon the class as a whole. Complaint ¶¶ 3-9, 29-33.

19.    Nor were complaints of the sort alleged in this case limited to Allmerica. The vanishing premium sales pitch found favor at virtually every life insurance company selling whole life policies during the decade of the 1980's. Its prevalence led to the institution of industry-wide reforms, such as the development of an NAIC proposed uniform regulation on sales illustrations, the distribution of the Illustration Questionnaire by the American Society of CLUs and ChFCs and the establishment of and ongoing investigations by the Multi-State Task Force.

20.    Illustrative of the trend in the industry to market vanishing premium policies is the number of lawsuits, such as this one, brought against various life insurance companies. The Ohio Supreme Court recently reversed a decision not to certify a class in *Cope v. Metropolitan Life Ins. Co.*, 696 N.E.2d 1001 (S.Ct. Ohio 1998). As in the present case, *Cope* was a class action alleging the defendant insurance company's fraudulent sales practices and misrepresentations in the sale of life insurance policies to the plaintiff class. Upon overruling the lower courts denial of class certification for lack of predominance and superiority, the Court stated that when a common fraud is perpetrated on a class, "... the existence of common misrepresentations obviated the need to elicit individual testimony as to each element of a fraud or misrepresentation especially where written misrepresentations or omissions are involved." *Id.* at 1004.

21.     Reliance will not generally undermine the predominance of common issues because reliance is an issue secondary to establishing the fact of defendant's liability. In re *Prudential* 962 F.Supp. at 516. The courts in both *Cope* and *Prudential* have recognized that direct evidence of individual reliance and inducement is not necessary when there are common omissions across the entire class. *Cope*, 696 N.E.2d at 436; In re *Prudential*, 962 F.Supp. at 516. "When there is nondisclosure of a material fact, courts permit inferences or presumptions of inducement and reliance. Thus, cases involving common omissions across an entire class are generally certified as class actions..." *Cope*, 696 N.E.2d at 436. In a case such as the present one, where plaintiffs' fraud-based claims arise largely from misleading omissions, reliance may generally be presumed. *In re Prudential*, 962 F.Supp. at 516.

22.     Recently, the Third Circuit released an opinion affirming the district court opinion certifying a nationwide settlement class in the *Prudential* litigation. In re: *Prudential Life Insurance Company America Sales Practice Litigation Agent Actions*, 148 F.3d 283 (3d Cir. 1998). The facts and circumstances in the *Prudential* litigation and the case at bar are virtually identical. When faced with similar predominance issues, the Third Circuit contrasted the situation in the *Prudential* vanishing premium lawsuit with the asbestos litigation in Amchem. The Court noted that the focus of the Prudential claims was on the "alleged intentional use of the fraudulent sales tactics" and Prudential management's conduct, thereby providing the "single central issue" that Amchem lacked. *Id.* at 314. Another key contract between the asbestos and the Prudential litigation was the lack of "futures plaintiffs" in the Prudential as the members of the class were "... readily identifiable and have already suffered injury by the purchase of a product that was misrepresented." *Id.*

23.     In addition to the common control over the policies alleged to harm the plaintiff class, there are also common questions set forth in the plaintiffs' complaint and class certification motion and memoranda. At bottom, this is the claim that defendant engaged in a concerted action to market insurance products through a deceptive common scheme. The legal and factual issues requiring extensive proof raised by these claims are directed primarily to the upstream conduct of

Allmerica. Accordingly, it is my opinion that this is indeed the type of uniform conduct case in which the common issues of the defendant's conduct do predominate. The conclusion that predominance is satisfied in this case is entirely consistent with the Supreme Court's acknowledgement that: "Predominance is a test readily met in certain cases alleging consumer or securities fraud of violations of the antitrust laws." *Amchem*, 117 S.Ct. at 2250.

### Predominance: Manageability in the Litigation Context

24.    In order to certify a settlement class after *Amchem*, it is no longer necessary to establish in the settlement context that there would be no manageability problems were the case to have gone to trial. 117 S.Ct. at 2248. Nevertheless, the Court expressed concern that class counsel who are negotiating a case that could never be tried are effectively "disarmed" in their efforts to secure the best possible deal for absent class members. 117 S.Ct. at 2248-49.

25.    I will therefore proceed to examine whether this case could successfully have been prosecuted as a class action outside the settlement context. For reasons I shall explain, I do not believe that this Court need be concerned that this settlement is the product of an unfair bargain entered into by "disarmed" class counsel. Unlike *Amchem*, this litigation was contested from its inception and the settlement was by no means assured. *Contrast Amchem*, 117 S. Ct. at 2239 ("The class action . . . instituted was not intended to be litigated.") Also, unlike *Amchem*, 117 S. Ct. at 2239, plaintiffs' counsel here had no separate inventory of individual cases; their allegiance was undivided and focused exclusively on achieving a successful result for the class. Furthermore, this case is brought under both federal consumer protection law and state common law. There is ample case law support for the certification of class actions in cases alleging violation of the federal consumer protection laws. In addition, the complaint alleges that the marketing of the defective insurance products were actionable under common law. For the reasons set forth below, the presence of the common law claims does not, in my view compromise the manageability of this case as a litigation class action.

26.    The complaint in this action sets forth claims grounded in breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, common law fraud, negligent

misrepresentation, and unjust enrichment statutory claims. Based on my experience in *Great West* and *In re Prudential*, as well as approximately a dozen other cases arising out of the marketing of defective insurance products in the 1980s, it is my opinion that such claims can be managed in one proceeding by either trying all claims under Massachusetts law (the law of the home forum of Allmerica) or under the laws of the fifty states handled in one proceeding.

27.   The case is certainly manageable under the laws of Massachusetts. Because the complained of business practices all originated in and emanated from Massachusetts, this does not raise the concerns present in *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985), in which the Supreme Court upheld a state court certification of a multistate class that included claims with no contact with the forum state. Instead, Massachusetts serves as the primary jurisdiction for the regulation of the insurance and marketing practices of the defendants.

28.   It is important to recognize that the harm alleged, the deceptive marketing of an inherently defective insurance product, occurred at the site of the development and marketing of that product, long before any individual consumer was even on the scene. Just as the doctrine of general jurisdiction overrides any due process objection to accountability in a corporation's home state, so too does the principle of *Shutts* override any due process objection to accountability under the home state's laws for the conduct undertaken in that state. *See Independent Business Forms v. A-M Graphics,* 127 F.3d 698,701 (8th Cir. 1997); *Grove v. Principal Mutual Life Ins. Co.,* No. 4-97-CV-90224 (S.D. Iowa, March 24, 1998); *In re Badger Mountain Irrigation District Securities Litigation,* 143 F.R.D. 693, 699-700 (W.D. Wash. 1992); *Grace v. Perception Technology Corp.,* 128 F.R.D. 165, 171-72 (D. Mass. 1989); *In re Kirschner Medical Corp. Securities Litigation,* 139 F.R.D. 74, 83-85 (D. Md. 1991); *Heller v. Schwann's Sales Enterprises, Inc.,* 548 N.W. 2d 287, 289-90 (Minn. Ct. App. 1996); *Microsoft v. Manning,* 914 S.W. 2d 602, 616 (Tex. Ct. App. 1995); *Weatherly v. Deloitte & Touche,* 905 S.W. 2d 642, 650 n.6 (Tex. Ct. App. 1995); *Sternberger v. Marathon Oil Co.,* 894 P.2d 788, 800-801 (Kan. 1995); *American Exp. Travel Related Servs. Co. V. Walton,* 883 S.W.2d 703, 710 (Tex. Civ. App. 1994); *Delgozzo v.*

*Kenny*, 628 A.2d 1080, 1092 (N.J. Super. 1993); *Clothsrigger, Inc., v. GTE Corp.*, 236 Cal. App. 1987); *Martin v. Heinhold Commodities, Inc.*, 510 N.E.2d 840, 846-47 (Ill. 1987).

29.    Moreover, since the case has proceeded as a 23(b)(3) class action, each plaintiff has received individual notice and an opportunity to opt out should alternative actions under other law prove more favorable for the prosecution of any claims.

30.    However, even if this Court were to determine that the case needed to be tried under the laws of the fifty states, it would still be manageable even for litigation purposes. In this regard, I refer the Court to the analysis that I presented to the District Court for the District of New Jersey in the *In re Prudential* matter. In *In re Prudential*, I analyzed the substantive laws of the fifty states for causes of action virtually identical to those asserted here, along the lines set forth by the Third Circuit in *In re School Asbestos Litigation*, 789 F.2d 996, 1010 (3d Cir. 1986), *cert. denied*, 479 U.S. 852 (1986)(approving a multistate class action for property-based economic harms where state-by-state variations could be accommodated within four basic categories). The court in *In re Prudential* found this same type of analysis persuasive, as did the court in *Great-West*. In *In re Prudential* and *Great-West*, the courts relied upon my analysis to certify a multistate class. In *Great-West*, the certification occurred despite vigorous challenge by defendants. In *In re Prudential*, the district court expressly relied upon my analysis in determining that certification of a class action was proper not only for settlement purposes, but for litigation as well had the case not settled. 962 F.Supp. at 525. This ruling was expressly affirmed by the Third Circuit.

31.    The bottom line of this analysis is quite simple: the state common law causes of action in this case all stem from fraudulent or negligent misrepresentations and seek remedies of damages, restitution or of reformation of the insurance contracts, as well as punitive damages. I append the analysis I performed in *In re Prudential* in the state law comparison grids attached as Appendix B. These grids show that the variations are either not that severe or can be accommodated within patterned jury instructions of the sort we developed in *Great-West* and were accepted by the court as well in *In re Prudential*.

32.     My review of state law claims shows that the common law claims stemming from misrepresentations in the sale of the product tend to fall into two or three categories depending on the level of scienter required by state law. In *Great West*, we proposed patterned jury instructions to the Court that would allow a short sequence of answers ranging from the most stringent to the most liberal standard of liability on each common law claim.  If the jury were to find on the most exacting standard, for example, the question of liability could be established for all state law claims.  If the jury were to find only that a mid-tier level of culpability could be met, then claims requiring a higher level of culpability (as with gross negligence, for example) would not be satisfied and only those plaintiffs residing in the states with lesser standards of culpability would be able to recover on that claim.  It is my opinion, that this type of patterned jury instruction can be readily developed for the various types of common law claims presented in a case such as the instant action.  This was accepted by the courts in both *Great-West* and *In re Prudential.*  It bears emphasis that what is proposed is not a blending of state law, but the application of each state's law through a unified trial presentation.

33.     It is therefore my conclusion that such a case could be tried either under Massachusetts law or under the laws of the fifty states in one proceeding.  Accordingly, the legal standards applicable here do not defeat the predominance requirement of Rule 23(b)(3), nor do they compromise the capacity of counsel to prosecute the claims, or render the representation of absent class members inadequate.

### Intraclass Conflicts and Allocation Issues

34.     This case does not raise the intraclass conflicts that doomed the proposed settlement in *Amchem*.  The key to the Court's analysis in *Amchem* was that different groups of plaintiffs were fundamentally differently situated.  These differences arose from fundamentally different state laws governing personal injury claims, differences in the exposure and harm suffered by the plaintiffs, differences in personal suffering caused by exposure to asbestos, and so forth.  There was no avoiding the fact that the injuries suffered were idiosyncratically specific to each individual.  This was in turn compounded by the attorneys having to decide how a fixed amount of money was

to be distributed among differently situated groups: injured versus noninjured; present exposed versus unknown exposed; future serious illnesses versus future lesser injuries.

35.     The Court in *Amchem* rejected the idea that counsel could make such fundamental allocation decisions, finding that having counsel play this role defeated the adequacy of representation requirement for class certification. The settlement in the present matter is designed to avoid entirely such allocation problems. The settlement preserves a high degree of relief to individual class members, without dividing up a fixed pot among differently situated groups. The aggregate available relief is not capped. Accordingly, no individual's recovery comes at the expense of any other class member. Further, no subpart of the class is adversely affected by the prosecution of the ADR claim by any other class member or subpart of the class. Accordingly, there is no structural compromise of the responsibility of counsel to all class members as was present in *Amchem*. To the contrary, the proposed settlement and its structural protections for the class members only reinforces the propriety of class certification here.

36.     The basic structure of the settlement. i.e. as general policy relief available without proof and an alternative dispute resolution to consider individual proof, is similar to that approved in the John Hancock and National Life cases. I similarly submitted a declaration in those cases in which I concluded that no *Amchem* conflict was present because there were no intraclass allocation decisions being made by the lawyers. I believe the same is true in this case.

### Jurisdiction

37.     There is no problem with this Court exercising jurisdiction over out-of-state absent class members under the Supreme Court's analysis in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). That case allows for the assertion of personal jurisdiction over all claims so long as absent class members receive notice and an opportunity to opt out, should they so wish. Because absent class members have been provided with individual notice, the opportunity to appear in the litigation, and the opportunity to opt out, the due process requirements of *Shutts* are satisfied.

38.     In the present action, there is no dispute that class Members are being given the opportunity to exclude themselves from the Class, and the Class Notice has clearly so stated.

39.     In addition, the settlement agreement provides for extensive publication notice. Based on the information I have reviewed, including the Settlement, it seems clear that the notice given meets legal standards for what is practicable notice under the circumstances.   Courts, including the United States Supreme Court, consistently have held that sending a copy of the notice to each Class Member whose address can be located with reasonable effort, by first class mail, along with publication notice, is more than sufficient to satisfy Due Process. *See, e.g., Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-77 (1974); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 318 (1950); *Zimmer Paper Prods. Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90-91 (3d Cir.), *cert. denied*, 474 U.S. 902 (1985) (collecting cases).  In the present case, individual notice has been sent by first class mail to the last known address of the affected policyowners.  Under these circumstances, it is my opinion that this Court plainly has jurisdiction over all absent Class Members who have not excluded themselves from the Class.

### Conclusion

40.     For the foregoing reasons, it is my opinion that the certifiability of this case as a class action does not depend on the parties' ability to reach a pretrial settlement.  This is an action that could be maintained as a class action even in the litigation context.  The common issues clearly predominate, and there are no structural defects that compromise the adequacy of the representation of the absent class members.

41.     I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury.

Samuel Issacharoff

Dated: January 25, 1999

# SAMUEL ISSACHAROFF

Univ. of Texas Law School
727 E. 26th Street
Austin, Texas 78705
(512) 232-1322, Fax: (512) 475-6087
email: sissacharoff@mail.law.utexas.edu

Home Address
4622 Lake View
Austin, Texas  78731
(512) 458-5750

Columbia Law School
435 West 116th Street
New York, NY 10027
(212) 854-2527, Fax: (212) 854-7946
email: sissac@law.columbia.edu

## ACADEMIC EXPERIENCE

### Columbia Law School

- Visiting Professor (1998-1999)

### University of Texas School of Law

- Joseph D. Jamail Centennial Chair in Law (1998-present)
- Charles Tilford McCormick Professor in Law (1994-1998)
- Professor and Preston Shirley Faculty Fellow (1993-94)
- Assistant Professor (1989-1993)

Courses Taught:  Civil Procedure, Employment Law, Voting Rights and Redistricting Law, Constitutional Law, Complex Litigation and Legal Process

### University of Pennsylvania Law School

- Lecturer in Law.  (1986-1989)

## EDUCATION

### Yale Law School, J.D. 1983
- Editor, Yale Law Journal.

### Graduate Center, City University of New York
- Graduate studies in Labor History (1976-77).
- University Fellowship, 1976.

### Universite de Paris,  1975-76

### State University of New York at Binghamton, B.A. 1975
- Major in History.

## PROFESSIONAL EXPERIENCE

- *Guerrieri, Edmond & James, Washington, D.C.* (1988-1993)
  Of counsel, handling special litigation for labor law firm. Representing International Association of Machinists against Eastern Airlines in $1.5 billion RICO action and challenge to corporate asset transfers.

- *Lawyers' Committee for Civil Rights Under Law, Washington, D.C.* (1985-1988)
  Staff attorney with Voting Rights Project (served as Acting Director of Voting Rights Project, 1985-86). Conducted voting rights litigation and other civil rights case work throughout the U.S. Served as co-counsel, lead counsel or consultant at all levels of federal practice, from District Court to U.S. Supreme Court.

- *Kirschner, Walters, Willig, Weinberg & Dempsey, Associate, Phila., PA.* (1985)
  Union labor law practice representing public and private employees in court, arbitration and administrative proceedings.

- *Lawyers' Committee for International Human Rights* (1984)
  Received J. Roderick MacArthur Fellowship to represent Lawyers' Committee in Argentina and Uruguay. Worked with Centro de Estudios Legales y Sociales in Buenos Aires on issues concerning transition from dictatorship to civilian government and prosecutions of former military rulers.

- *United States Court of Appeals for the Third Circuit* (1983-84)
  Law Clerk to Honorable Arlin M. Adams.

# PUBLICATIONS

## *Articles*

· *The Hydraulics of Campaign Finance Reform,* _____ TEX. L. REV. _____ (1999)(with Pamela Karlan).

· *Standing and Misunderstanding in Voting Rights Law,* 111 HARV. L. REV. 2276 (1998)(with Pamela Karlan).

· *Can Affirmative Action Be Defended?,* __ OHIO ST. L. J. _____ (forthcoming 1998).

· *Can There Be a Behavioral Law and Economics?,* __ VANDERBILT L. REV. _____ (forthcoming 1998).

· *Group Litigation of Consumer Claims: Lessons of the American Experience,* __ TEX. INT'L L. J. _____ (forthcoming 1998).

· *Politics as Markets: Partisan Lockups of the Democratic Process,* 50 STANFORD L. J. 643 (1998)(with Richard Pildes).

· *Creating Convergence: Debiasing Biased Litigants,* 22 J. OF LAW AND SOCIAL INQUIRY 913 (1998)(with Linda Babcock and George Loewenstein).

· *Is Age Discrimination Really Age Discrimination?: The ADEA's Unnatural Solution,* 72 N.Y.U. L. REV. 780 (1997)(with Erica Worth Harris).

· *Class Action Conflicts,* 30 U. C. DAVIS L. REV. 805 (1997).

· *The Constitutional Contours of Race and Politics,* 1995 SUPREME COURT REVIEW 45.

· *Contracting For Employment: The Limited Return of the Common Law,* 74 TEXAS LAW REVIEW 1783 (1996).

· *Identifying the Harm in Racial Gerrymandering Claims,* 1 MICH. J. OF RACE & LAW 47 (1996)(with Thomas C. Goldstein).

· *Supreme Court Destabilization of Single-Member Districts,* 1995 UNIV. OF CHICAGO LEGAL FORUM 205.

· *Unintended Consequences of Mandatory Disclosure,* 73 TEXAS L. REV. 753 (1995)(with George Loewenstein).

· *Groups and the Right to Vote,* 44 EMORY L. J. 869 (1995)

· *Women and the Workplace: Accommodating the Demands of Pregnancy,* 95 COL. L. REV. 2154 (1994)(with Elyse Rosenblum).

· *Race and Redistricting: Drawing Constitutional Lines after Shaw v. Reno,* 92 MICHIGAN LAW REVIEW 588 (1993)(with T. Alexander Aleinikoff).

- *Biased Judgments of Fairness in Bargaining*, 85 AMERICAN ECONOMIC REVIEW 1337 (1995)(with L. Babcock, G. Loewenstein, and C. Camerer).

- *Judging Politics: The Elusive Quest for Judicial Review of Political Fairness*, 71 TEXAS LAW REVIEW 1643 (1993).

- *Source Dependence in the Valuation of Objects*, 7 JOURNAL OF BEHAVIORAL DECISIONMAKING 157 (1994)(with G. Loewenstein)

- *Polarized Voting and the Political Process: The Transformation of Voting Rights Jurisprudence*, 90 MICH. L. REV. 1833 (1992).

- *When Substance Mandates Procedure: Martin v. Wilks and the Rights of Vested Incumbents in Civil Rights Consent Decrees*, 77 CORNELL L. REV. 189 (1992).

- *Self-Serving Assessments of Fairness and Pretrial Bargaining*, 22 JOURNAL OF LEGAL STUDIES 135 (1992)(with George Loewenstein, Colin Camerer, Linda Babcock).

- *The Census Undercount and Minority Representation: The Constitutional Obligation of the States to Guarantee Equal Representation*, 13 REVIEW OF LITIGATION 1 (1993)(with Allan J. Lichtman).

- *Administering Damage Awards in Mass-Tort Litigation*, 10 REV. OF LITIG. 463 (1991).

- *Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data*, 7 J. LAW & POLITICS 525 (1991)(with Allan J. Lichtman).

- *Second Thoughts About Summary Judgment*, 100 YALE L.J. 73 (1990)(with George Loewenstein).

- *Litigating for Equality of Political Opportunity*, in J. Lobel, ed., CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Clark, Boardman, 1987).

- *Dictatorship on Trial: Prosecution of Human Rights Violations in Argentina*, 10 YALE J. INT'L LAW 118 (1985) (with E. Mignone and C. Estlund).

- *Note, Making the Violation Fit the Remedy: The Intent Standard and Equal Protection Law*, 92 YALE L.J. 328 (1982).


## *Review Essays*

- *Contractual Liberties in Discriminatory Markets*, Review of R. Epstein, FORBIDDEN GROUNDS, 70 TEX. L. REV. 1219 (1992).

- *Reconstructing Employment*, Review of P. Weiler, GOVERNING THE WORKPLACE: THE FUTURE OF LABOR AND EMPLOYMENT LAW, 104 HARV. L. REV. 607 (1990).

## ACADEMIC AWARDS

·  *Texas Excellence Teaching Award in the School of Law*
   Annual student-selected award to one faculty member

·  *James W. Vick Texas Excellence Awards in Academic Advising*
   University-Wide Award

·  *Open Door Award*
   Law School Student Award

## PERSONAL

·  *Born:* Sept. 15, 1954, Buenos Aires, Argentina

·  *Married* to Prof. Cynthia Estlund, University of Texas School of Law

·  *Children:* Jessica, 11; Lucas, 10

- "Adjusting Census Data For Reapportionment: An Independent Role for the States," TEXAS LAWYER, March 18, 1991 (with A. Lichtman).

- "The 37.5 Percent Solution: 'Limited Voting' Could Rescue Judiciary," TEXAS LAWYER, March 5, 1990.

- "The Texas Judiciary and the Voting Rights Act: Background and Options," Report repared for the Texas Policy Research Forum (1989).

- "The Generals Give Back Uruguay," Human Rights Report of the Lawyers' Committee for International Human Rights (1985)(with C. Estlund).

## SELECTED PROFESSIONAL ACTIVITIES

- MEMBER, American Law Institute.

- MEMBER, Judicial Selection Task Force of the Texas Commission on Judicial Efficiency (1995-1997).

- LEGAL CONSULTANT, National Research Council, Panel on Census Requirements in the Year 2000 and Beyond (1993-1995).

- CONSULTANT, State of Florida, *Johnson v. DeGrandy*, 114 S.Ct. 2647 (1994)(Florida legislative redistricting litigation).

- COUNSEL to State of Texas for 1992 Redistricting in *Richards v. Terrazas*, No. 91-1270 (U.S. Supreme Court), and *Texas v. United States*, No. 91-2383 (D.D.C.). (1992-1993).

- SPECIAL MASTER TASKFORCE for Eastern District of Texas Asbestos Litigation, *Cimino v. Raymark Industries, Inc.*, 751 F.Supp. 649 (E.D. Tex. 1990). (1989-1990).

- BOARD OF DIRECTORS, Lawyers' Committee for Civil Rights Under Law of Texas. (1991-1995); Executive Committee of the Board of Directors (1993-1995).

- COUNSEL to State of Texas and University of Texas Law School in *Hopwood v. State of Texas and Regents of the University of Texas System*, No. 92 CA 563 (W.D. Texas, 1992)(challenge to School of Law affirmative action admissions practices)(1992-present).

### *Books*

· THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS (wtih Pamela Karlan and Richard Pildes)*(*Foundation Press, 1997).

### *Book Chapters*

· *Too Much Lawyering, Too Little Law*, in THE REFORM OF CIVIL PROCEDURE, (A.A.S. Zuckerman & R. Cranston, eds., Oxford Univ. Press, 1995).

· *Bargaining Impediments and Settlement Behavior* (with Charles Silver and Kent Syverud), in DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP, Anderson, ed., JAI Press, 1996).

· *The Redistricting Morass*, in AFFIRMATIVE ACTION AND REPRESENTATION, (A. Peacock, ed., Carolina Acad. Press, 1997).

### *Reports, Other Publications, and Current Manuscripts*

· "Poltical Fairness and Judicial Review," ENCYCLOPEDIA OF THE AMERICAN CONSITUTION (1998).

· "The Census and the Constitution," ENCYCLOPEDIA OF THE AMERICAN CONSITUTION (1998).

· "The Destruction of Public Funding," TEXAS LAWYER, May 12, 1997, at 20 (with David Horan).

· "All for One," THE NEW REPUBLIC, Nov. 18, 1996, at 10 (with Richard Pildes).

· "No Place for Political Gerrymandering," TEXAS LAWYER, Aug. 5, 1996 (with Richard Pildes).

· "Racial Gerrymandering in a Complex World: A Reply to Judge Sentelle," 45 CATH. U. LAW REV. 1257 (1996).

· "Should There Be Rules of Procedure?," Leiden University, Institute of Anglo-American Law, Clifford Chance Distinguished Lecture Series (Feb. 1995)

· "Conference: The Supreme Court, Racial Politics, and the Right to Vote: *Shaw v. Reno* and the Future of the Voting Rights Act, 44 AMERICAN UNIV. L. REV. 1 (1994).

· "A Highly Visible Bloodletting," AUSTIN AMERICAN STATESMAN, Oct. 2, 1994 (Op-ed piece on redistricting).

· "Race and Redistricting," 2 RECONSTRUCTION, No. 3 (1994).

· "The State of Voting Rights Law," 3 ISSUES IN NATIONAL AFFAIRS No. 1 (1993)(Paper prepared for the American Jewish Committee).

· "Remedial Options for the Selection of the Texas Judiciary," Report prepared for settlement negotiations in *LULAC/Houston Lawyers' Association v. State of Texas*, Jan. 14, 1993,